Matthias, J.
 

 A novel situation is presented by the record in this case. The claim for damages is predicated upon allegations of negligent operation of defendant’s motor truck by his employee in the following particulars: Excessive, unlawful and dangerous rate of speed; failing to keep a proper lookout in approaching the intersection; failing to keep the truck under control and divert its course so as to avoid the collision upon seeing the perilous position of plaintiff’s decedent ; and failing to have serviceable brakes and horn.
 

 In support of the claim thus made in the petition, the record discloses the testimony of but one person who saw the collision, Mrs. Mertie Shoemaker. Her entire testimony, insofar as it relates to the approach of the vehicles to the intersection and their collision, is as follows:
 

 ‘ ‘ Q. When you left your house to start toward Dorothy Elliott’s what was the first that you noticed about any traffic on the highway? A. Well, I was walking down the road, and I happened to look down that way and I saw this here Phipps, or whatever his name was, coming up the road on the other side of the bridge up this way.
 

 “Q. When you say ‘on the other side of the bridge up this way,’ you mean he was between the bridge and where you were at? A. Coming straight up, yes.
 

 ‘ ‘ Q. How far from the corner was he when you first saw him? A. Oh, I couldn’t tell about how far that is, I don’t know.
 

 “Q. And where was the grocery truck when you first saw it? A. Coming out from Trautman’s.
 

 “Q. And which car did you see first? A. Well, I looked down and saw Phipps, and I looked down that way and saw the grocery truck coming.
 

 “Q. And was it coming out of Trautman’s at that
 
 *558
 
 time? A. He was coming out the lane; he had got out on the road by that time.
 

 “Q. Did you notice whether or not the truck stopped at the end of the lane? A. The truck stopped at the end of the lane.
 

 “Q. How long was it standing there? A. Oh, I couldn’t tell you that, I don’t know.
 

 “Q. And then you were walking towards the comer during this time ? A. Uh-huh.
 

 “Q. And did you observe the progress, or did you observe the truck as it moved from the end of the lane towards the road where it crosses? A. I don’t know just what you mean.
 

 “Q. Did you see the truck start away from the end of the lane? A. Uh-huh.
 

 ‘ ‘ Q. And were you looking at it while it was going down the highway or not? A. Yes, I seen it pull up and start out.
 

 “Q. And you were also watching the Pitt car approaching the corner, were you.? A. Well, not exactly, I just happened to see it. I wasn’t watching for it or anything. I happened to see it coming up the road.
 

 “Q. It was on the same road, coming toward you, you were walking on? A. Yes,, toward Claibourne. # * *
 

 “Q. Describe to the jury in your own words what happened at the comer as you saw it? A. As I was going down I seen Phipps coming up and the grocery boy coming out, and whenever they got up there, why, the grocery truck stopped and then he pulled out, but I don’t know whether Phipps run into him or how that was, it was done so quick I couldn’t tell.
 

 “Q. I see. A. And the grocery truck and the car, whenever they hit, the car went up and then come back down on the ground and bounced up again and the fellow fell out and the car came back down and bounced up again and fell over where' he was laying over by the fence.
 

 
 *559
 
 “Q. Now, that was a little too fast for me. Just describe what the car did after they came together. "When you say ‘the car’ you mean this Ford automobile? A. Uh-huh.
 

 “Q. All right, just tell us again after they hit? A. Whenever they hit the Ford went up and he came out, but I don’t know whether he came out the door or out the windshield, I couldn’t tell, but I know he come out, and then it bounced down to the ground again and came up again and fell over on him where he was laying by the fence.
 

 “Q. Now, can you say whether or not the car turned end over end? A. I don’t know whether it turned end over end or not. It was done so quick I couldn’t tell.
 

 “Q. What did the grocery truck do? A. The grocery truck stopped. He got out before it clear stopped.
 

 “Q. And when it clear stopped where was it? A. He was back there where the accident happened.
 

 “Q. Well, with reference to this crossroads? You say he was going west. A. Uh-huh, I suppose.
 

 ‘ ‘ Q. How far did the truck go west to where it finally stopped again? A. Just right over across the road a little piece. I don’t know how far it was, it wasn’t very far, just a few steps.
 

 “Q. Would you say as to whether or not the back end of the truck was as far as the fence? A. Yes, something like that I imagine.
 

 “Q. Was it farther than that? A. Well, I don’t know whether it was any farther than that, but about like that, I guess. * * *
 

 “Q. Now, in walking down the road towards this corner what do you say to the jury with reference to how fast the grocery truck was going as it approached the corner after it left the lane? A. Oh, it was doing something like ten, maybe twelve miles, something like that.
 

 “Q. Before it clear stopped, you mean? A. Yes, something like that. It wasn’t going so very fast.
 

 
 *560
 
 “Q. And then the Pitt car as it was coming up toward the corner? A. It was coming just a burning the wind. The dust was just a flying behind it. I don’t know how fast it was going.
 

 “Q. You say the dust was flying behind it? A. Yes.
 

 “Q. And the road was dusty was it? A. I suppose or there wouldn’t have been dust behind it.
 

 ‘ ‘ Q. And did you notice as to whether or not the Pitt car slowed up any before it was hit by the grocery truck? A. It didn’t slow up any.
 

 “Q. Didn’t slow up a bit? A. No.
 

 “Q. Going just as fast at the time it was hit as it was coming toward the corner? A. (Nods head ‘yes.’)
 

 “Q. Did it go any faster as it approached the corner? A. I don’t know, I couldn’t say.
 

 “Q. How close was the truck to the corner when it started to slow up, or did you see it start to slow up to stop for the corner before it pulled out into the intersection? A. I never paid any attention. I know it had stopped when it got to the crossroad, but I never paid any attention to whether it was slowing or what it was.
 

 “Q. You wasn’t looking at the truck? A. I just happened to look up and seen the Phipps coming and the truck coming. I don’t know how fast it was going or anything about it.”
 

 Her testimony on cross-examination is as follows:
 

 “Q. At the same time you saw this truck come out the lane on the road — on the other road going west? A. TJh-huh.
 

 “Q. That is not very far from the intersection up to that lane, is it? A. Not very far.
 

 ‘ ‘ Q. And you say as the truck drove down the road toward the intersection, before it got to the intersection, it was going you would think ten or twelve miles an hour? A. Something like that, uh-huh, about ten or twelve miles.
 

 “Q. And the car as it came up you say was ‘burn
 
 *561
 
 ing the wind,’ you méan by that it was going pretty fast? A. Going pretty fast.
 

 “Q. And it didn’t slow up? A. Huh-uh.
 

 “Q. Would you say it was going forty or fifty mile an hour? A. I imagine something like that. I couldn’t tell just how fast it was going.
 

 “Q. Now then, after the car and truck got together you say that — What was the driver of the truck’s name? A. Dalton Kemp.
 

 “Q. (continuing) Dalton Kemp, he jumped out of the truck before it stopped, didn’t he? A. Yes.
 

 ‘ ‘ Q. When the truck was still in the intersection he jumped out of it, jumped out and ran back, and ran toward the car? A. Uh-huh.
 

 “Q. The Ford? A. Yes.
 

 “Q. And the truck ran on and stopped at the right side of the road going west just beyond the intersection, didn’t he? A. Uh-huh.”
 

 Later, upon being recalled by counsel for the defendant, she testified as follows:
 

 “Q. Well, did you see the truck stop as it came out of the lane? A. Well, I seen the truck come out that way, but I said it was a going about ten or twelve miles an hour but I couldn’t say whether it stopped right there at the end of the lane or not.
 

 “Q. After it came down toward the intersection— you saw it all the time until the collision, didn’t you? A. Uh-huh.
 

 “Q. Did it stop at any time before it came in contact with the Pitt car at the intersection? A. Well, I couldn’t tell you exactly whether it stopped or not, but it slowed down. It wasn’t going over ten or twelve miles, but I couldn’t tell whether it dead stopped or not. _
 

 “Q. You can’t tell whether it dead stopped or not. What is your opinion? Did it stop or was it going about ten or twelve miles an hour at all times before
 
 *562
 
 it stopped? A. In my opinion it was going ten or twelve miles an hour.
 

 “ Q. In your opinion it did not come to a stop at the intersection? A. No, not until afterwards.”
 

 The picture presented by this evidence discloses the automobile coming up the road from the south “just a burning the wind. The dust was just a flying behind it,” and “It didn’t slow up any,” “Going just as fast at the time it was hit as it was coming toward the corner,” “something like that” (forty or fifty miles an hour).
 

 At the same time the truck had come out of a lane, stopped, then turned west into the road and continued to the intersection “going something like ten, maybe twelve miles, something like that.” The truck either stopped or was slowed down, the witness quite apparently being uncertain “whether it dead stopped or not,” but finally saying it slowed down and “did not come to a stop at the intersection *
 
 *
 
 * not until afterwards.”
 

 There is here no element calling for the application of the last-clear-chance doctrine; neither is there any evidence tending to show excessive or unlawful speed upon the part of defendant’s employee.. It must be conceded that by reason of his position on the right in approaching and entering the intersection he had the absolute right of way under the provisions of the statute as interpreted and applied in the case of
 
 Morris
 
 v.
 
 Bloomgren,
 
 127 Ohio St., 147, 187 N. E., 2, 89 A. L. R., 831.
 

 Negligence is never presumed; neither does a presumption of negligence arise from the mere fact that a collision occurred which resulted in injury. Some evidence must be adduced tending to show failure in the performance of some duty by the party charged therewith, and it must be evidence from which a rational conclusion of negligence can be drawn.
 
 Martin,
 
 Jr., v.
 
 Heintz,
 
 126 Ohio St., 227, 184 N. E., 852;
 
 Hamden
 
 
 *563
 

 Lodge
 
 v.
 
 Ohio Fuel Gas Co.,
 
 127 Ohio St., 469, 189 N. E., 246.
 

 Counsel for plaintiff have apparently completely abandoned the charge made that the defendant was driving at an excessive rate of speed and resort to the theory that, though entitled to the right of way accorded him by the statute, the driver of defendant’s truck yielded the right of way by stopping at the intersection, and thereafter both drivers were subject to the common-law rule and each was required to exercise ordinary care to avoid injuring the other, and consequently the question whether the defendant’s driver was in the exercise of ordinary care and, if not, whether his lack of ordinary care was the proximate cause of the injury became questions for the jury
 

 Before such theory of the case is maintainable, it is incumbent upon the plaintiff to adduce evidence that the defendant’s driver did by some action or indication yield the right of way to the plaintiff’s decedent. There is no evidence in the record that the defendant’s employee was not proceeding in a lawful manner, or that he yielded or otherwise lost the right of way. It would be a queer doctrine to assert and apply that the exercise of caution is negligence. It cannot be held that a motorist, by slowing down before entering an intersection, thereby waives the right of way conferred by statute and justifies the driver on the left to proceed at a high rate of speed across the intersection.
 
 Martin
 
 v.
 
 Monk,
 
 173 Wash., 134, 22 P. (2d), 51.
 

 The only negligent operation shown or indicated by the evidence was that of the plaintiff’s decedent. It is our conclusion that the.trial court was correct in directing a verdict for the defendant. The judgment of the Court of Appeals is accordingly reversed and that of the Common Pleas Court affirmed.
 

 Judgment reversed.
 

 Weygandt, C. J., Turner, Hart, Zimmerman and Bettman, JJ., concur.